**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1. JOHN KRUEGER, individually and as Co-Administrator of the Estate of Jeffery Krueger, and<br>2. PAMELA KRUEGER, individually and as Co-Administrator of the Estate of Jeffery Krueger,<br>　　　*Plaintiffs*,<br><br>v.<br><br>1. SHERIFF CHRIS ELLIOT, in his official capacity as Sheriff of Wagoner County,<br>2. WAGONER EMERGENCY SERVICES, INC., a/k/a WAGONER EMS,<br>3. KALEB PHILLIPS, individually,<br>4. NICHOLAS ORR, individually,<br>5. JEFF PATTERSON, individually,<br>6. ALAN SMITH, individually,<br>7. DREW CRAIG, individually,<br>8. TYLER McFARLAND, individually,<br>9. CLARENCE COLLINS, individually,<br>10. COREY NEVITT, individually,<br>11. TRAVIS POTTS, individually,<br>12. BEN BLAIR, individually,<br>13. MATTHEW LOTT, individually, and<br>14. ELIZABETH CROCKETT, individually.<br>　　　*Defendants*. | Case No. CIV-21-044-RAW |

**ORDER**[1]

This action arises from the death of Jeffrey Krueger on July 1, 2019.  Plaintiffs allege that he was beaten, tased, cuffed, and ultimately suffered positional asphyxiation resulting in his death.  Plaintiffs bring this action against:

- the Sheriff of Wagoner County, Chris Elliott, in his official capacity (hereinafter "Sheriff Elliott");

---

[1] When the court cites to the record, it uses the pagination and attachment numbers assigned by CM/ECF.

- Wagoner County Lieutenant Elizabeth Crockett, Deputy Sheriff Kaleb Phillips, Deputy Sheriff Nicholas Orr, and Deputy Sheriff Matthew Lott, each in their individual capacities (hereinafter collectively referred to as "County Defendants");[2]
- City of Wagoner Police Officers Ben Blair, Clarence Collins, Drew Craig, Tyler McFarland, Corey Nevitt, and Travis Potts, each in their individual capacities (hereinafter collectively referred to as "City Defendants"); and
- Emergency Medical Technicians Jeff Patterson and Alan Smith, each in their individual capacities (hereinafter collectively referred to as "EMT Defendants").[3]

Plaintiffs bring the following claims pursuant to 42 U.S.C. § 1983:

1. illegal arrest in violation of the Fourth Amendment against Sheriff Elliot, the County Defendants, and the City Defendants;
2. excessive force in violation of the Fourth Amendment against all Defendants;
3. inadequate training and supervision in violation of the Fourth Amendment against Sheriff Elliott;

Plaintiffs bring the following state law claims:

4. medical negligence and wrongful death against Wagoner EMS and the EMT Defendants;
5. negligence and wrongful death under the Oklahoma Governmental Tort Claims Act (hereinafter "GTCA") against Sheriff Elliott; and
6. assault and battery against all Defendants.

Now before the court are the motions for summary judgment filed by Sheriff Elliott and

the County Defendants:

- Sheriff Elliott's [Docket No. 301], Plaintiffs' response [Docket No. 329], and Sheriff Elliott's reply [Docket No. 343];
- Lieutenant Crockett's [Docket No. 302], Plaintiffs' response [Docket No. 324], and Lieutenant Crockett's reply [Docket No. 340];
- Deputy Phillips' [Docket No. 306], Plaintiffs' response [Docket No. 323], and Deputy Phillips' reply [Docket No. 351];
- Deputy Orr's [Docket No. 307]; Plaintiffs' response [Docket No. 323], and Deputy Orr's reply [Docket No. 351]; and
- Deputy Lott's [Docket No. 308], Plaintiffs' response [Docket No. 325], and Deputy Lott's reply [Docket No. 350.

---

[2] Plaintiffs also sued Major Dustin Dorr and Deputy Sheriff Colby North, but they have since been dismissed with prejudice by joint stipulation.  Docket No. 316.

[3] Plaintiffs also sued Wagoner Emergency Services, Inc., a/k/a Wagoner EMS.  As Wagoner EMS failed to plead or otherwise defend as directed, a Clerk's Entry of Default has been entered.  Docket No. 64.

With leave of court, Plaintiffs also filed a "base brief of general law for responses in opposition" to all of the seven pending motions for summary judgment [Docket No. 321]. Sheriff Elliott's and the County Defendants' exhibits are filed at Docket Nos. 303-1 through 303-27; Docket Nos. 309-1 through 309-11; Docket Nos. 351-1 through 351-2; and Docket No. 350-1. Plaintiffs' exhibits are filed at Docket Nos. 327-1 through 327-30 and Docket No. 329-1. Each party submitted the 17:56 minute video footage from Deputy Phillips' Body Cam (hereinafter referred to as "Phillips Body Cam"),[4] as well as the 5:39 minute video footage from another body cam (hereinafter referred to as "AXON Body Cam").[5] Additionally, Plaintiffs and the County Defendants submitted the 7:25 minute QT Video, and the County Defendants submitted the 1:07:56 minute video footage from Deputy Lott's Dash Cam (hereinafter referred to as "Lott Dash Cam"). The court will address the other pending motions for summary judgment in separate orders.[6]

As stated above, Plaintiffs assert three claims against the County Defendants, including their 42 U.S.C. § 1983 claims for illegal arrest and for excessive force in violation of Mr. Krueger's Fourth Amendment rights and their state law claims for assault and battery. The County Defendants argue that they are entitled to qualified immunity with regard to the § 1983 claims and that the assault and battery claim is barred by the statute of limitations and 51 OKLA. STAT. § 163(C).

Plaintiffs also assert § 1983 claims against Sheriff Elliott in his official capacity based on

---

[4] As the Phillips Body Cam video includes a timestamp, the court references it by the timestamp.
[5] The AXON Body Cam video is referenced differently by the parties, including being connected with multiple officers. It is most commonly referenced as being connected with Bob Haley and labeled an "AXON Video."
[6] Also pending are motions by the City Defendants [Docket No. 297] and by the EMT Defendants [Docket No. 295].

the Wagoner County Sheriff's Office's (hereinafter "WCSO") policies, customs and procedures, as well as for inadequate training and supervision. Plaintiffs bring state law claims for negligence and wrongful death and for assault and battery against Sheriff Elliott.

## I.      Standard of Review

The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.'" *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1257-58 (10th Cir. 2006) (citation omitted). Conversely, if "the record does not unequivocally point in one direction and allows for a genuine dispute concerning the facts, '[a]ll disputed facts must be resolved in favor of the party resisting summary judgment.'" *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 757 (10th Cir. 2021).

In applying the summary judgment standard, the court views the evidence and draws "reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* at 1258 (citation omitted). At this stage, however, a plaintiff may not rely on mere allegations, but must have set forth, by affidavit or other evidence, specific facts in support of the allegations. *Id.* "Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient

to oppose summary judgment." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003) (citation omitted).  Additionally, "the general proposition that we accept plaintiff's version of the facts in the qualified-immunity summary-judgment setting 'is not true to the extent that there is *clear contrary* video evidence of the incident at issue.'" *Estate of Taylor*, 16 F.4th at 757 (citing *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) and adding emphasis).

While at the summary judgment stage evidence need not be submitted "in a form that would be admissible at trial," "the content or substance of the evidence must be admissible." *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) and *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)).  For example, the court disregards "inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form." *Argo v. Id.* (emphasis in original).  Furthermore, "affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  "Testimony which is grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).

### Qualified Immunity

The affirmative defense of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant raises a qualified immunity defense in response to a motion to dismiss or a motion for summary judgment,[7] the burden shifts to the plaintiff and the court employs a two-part test. *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012). A plaintiff must show: "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (citing *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)). "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Id*. (citation omitted). The court has discretion to decide which of the two prongs to address first in light of the circumstances of the case. *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).

In a case with multiple defendants, a defendant's entitlement to qualified immunity turns "on an *individual assessment* of each defendant's conduct and culpability." *Pahls v. Thomas*, 718 F.3d 1210, 1233 (10th Cir. 2013) (emphasis added). "Plaintiffs must do more than show that their rights 'were violated' or that 'defendants,' as a collective and undifferentiated whole, were responsible for those violations." *Id*. at 1228 (citations omitted). Plaintiffs "must identify specific actions taken by particular defendants, or specific policies over which particular defendants possessed supervisory responsibility, that violated their clearly established rights." *Id*.

"A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *Knopf*, 774 F.3d at 944 (citation omitted). A law is not clearly established

---

[7] "The legally relevant factors for a qualified immunity decision will be different at the summary judgment stage – no longer can the plaintiffs rest on facts as alleged in the pleadings." *Stonecipher v. Valles*, 759 F.3d 1134, 1148, n.9 (10th Cir. 2014).

unless existing precedent has "placed the statutory or constitutional question beyond debate." *Id.* (citation omitted).  This is an objective test.  *Brown*, 662 F.3d at 1164.

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citing *Ashcroft*, 563 U.S. at 742).  See also *Knopf*, 884 F.3d at 944 (citing *Ashcroft*, 563 U.S. at 742).  Rather, "the clearly established law must be 'particularized' to the facts of the case." *Knopf*, 884 F.3d at 944 (citation omitted).  "A prior case need not have identical facts.  Rather, the pertinent question is whether it would have been clear to a reasonable officer that his or her conduct was unlawful in the situation." *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (citations and internal brackets and quotation marks omitted). See also *Perry v. Durborow*, 892 F.3d 1116, 1126 (10th Cir. 2018).

## II.      Undisputed Material Facts[8]

### <u>Deputies Orr and Phillips</u>

On the evening of July 1, 2019, Deputy Orr was on duty in his clearly marked patrol vehicle.  Docket No. 306, at 12-13[9]; Docket No. 323, at 8; and Docket No. 351, at 6-7.  At approximately 9:45 p.m., he was gassing up his vehicle at the QuikTrip on the intersection of Hwy 69 and Hwy 51 in Wagoner, Oklahoma, when the decedent, Mr. Krueger, pulled in and stopped at the gas pump behind him. *Id*.  Mr. Krueger exited his vehicle and began to clean his

---

[8] The court notes that "material facts set forth in the statement of material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the nonmovant using the procedures set forth in this rule."  Local Civil Rule 56.1(e).  This includes instances where a nonmovant indicates that a fact is disputed, but then argues a separate point without disputing the fact or providing any citation to evidence that controverts the fact.
[9] The statements of undisputed material fact are identical or nearly so in Deputy Orr's and Deputy Phillips' motions.  The court cites to Deputy Phillips' at Docket No. 306.

windshield. *Id*. Immediately prior to Mr. Krueger pulling up, Deputy Orr heard squealing tires. *Id*.

As Deputy Orr was standing at the gas pumps, he noticed Mr. Krueger appeared to be talking to himself and holding his hand as if he were holding a cellphone. *Id*. Deputy Orr also noticed that Mr. Krueger had nothing in his hand, and he did not see an earpiece in his ears. *Id*. The behavior seemed odd to Deputy Orr, and he wondered if Mr. Krueger had been the one squealing his tires. *Id*. Deputy Orr then went inside the QuikTrip. *Id*. Mr. Krueger continued to waive his arms around and appeared to be talking to himself. *Id*. He then got back into his vehicle and drove north. *Id*. Deputy Orr believed Mr. Krueger had exhibited signs of possible intoxication. *Id*.

When Deputy Orr came out of the QuikTrip, he used his cellphone to call Deputy Phillips who he knew was also on patrol in the area. Docket No. 306, at 13; Docket No. 323, at 8, and Docket No. 351, at 7. Deputy Orr told Deputy Phillips that he observed a man in a dark colored vehicle engaging in odd behavior that might be a possible DUI and asked him to follow and observe the vehicle to see if there was a reason to pull the driver over for further investigation. *Id*.[10]

Shortly thereafter, Deputy Phillips informed Deputy Orr that he was following Mr. Krueger's vehicle and that Mr. Krueger was traveling at a high rate of speed and was failing to maintain his lane of travel. Docket No. 306, at 14; Docket No. 323, at 9, and Docket No. 351, at 8. Deputy Orr followed behind Deputy Phillips and saw Deputy Phillips activate his emergency lights. *Id*. Mr. Krueger immediately pulled his vehicle into the center turn lane of the highway

---

[10] Plaintiffs argue that Deputy Orr had no probable cause. Such arguments are more appropriate later in the briefings. Plaintiffs do not provide any actual dispute to the facts as listed by Defendants.

and stopped abruptly.  *Id.*  Deputy Phillips pulled his vehicle into the center turn lane behind Mr.

Krueger.  Deputy Orr also pulled into the center turn lane.  *Id.*

When Mr. Krueger stopped, he swung open his driver's side door.  *Id.*  Deputy Phillips

saw movement by Mr. Krueger inside the vehicle.  *Id.*  Deputy Phillips exited his patrol vehicle,

drew his service weapon, and started calling out commands to Mr. Krueger to show his hands.

*Id.*; Docket No. 309-10, at 10 and 14-15; Docket No. 309-5, at 5; Docket No. 309-4, at 8 and 24.

Deputy Orr pulled up, exited his patrol vehicle, and approached as well.  Docket No. 306, at 14;

Docket No. 323, at 10, and Docket No. 351, at 8-9.

Mr. Krueger's door remained swung open, and he continued to search around the interior

of the vehicle despite the Deputies' commands.  Docket No. 306, at 14-15; Docket No. 323, at

10-11, and Docket No. 351, at 9.  Mr. Krueger was reaching in between the seats and into the

console, and there were times the Deputies could not see Mr. Krueger's hands.  *Id.*  Both

Deputies were in full uniform of the WCSO.  *Id.*  Both Deputies had deployed full flashing

emergency lights.  *Id.*  Because Mr. Krueger was ignoring their commands and continuing to

search around the interior of the car for an unknown item, the Deputies wanted to remove him

from the car.  *Id.*  Deputy Phillips then started giving commands to Mr. Krueger to "get out of

the car."  *Id.*; Docket No. 309-4, at 8 and 10; Docket No. 309-5, at 5 and 10.

Deputy Phillips then came closer to try to remove Mr. Krueger from the car.  Docket No.

306, at 14-15; Docket No. 323, at 10-11; Docket No. 351, at 9.  Deputy Phillips reached in to

unfasten Mr. Krueger's seatbelt.  *Id.*  When Deputy Phillips tried to remove Mr. Krueger from

the car, Mr. Krueger grabbed his leg and his left arm.  *Id*; Docket No 309-10, at 19, 25-26, and

36-37; Docket No. 309-5, at 6 and 10.[11]

The Deputies then both grabbed onto Mr. Krueger's arms and tried to pull him out of the car while yelling to him "give us your hands" and "get on the ground."  Docket No. 306, at 15-16; Docket No. 323, at 11-12; Docket No. 351, at 10.  Mr. Krueger was fighting, resisting, and trying to pull back into the vehicle.  *Id*.  Deputy Orr then grabbed Mr. Krueger's hair and tried to pull him out of the car.  *Id*.  The Deputies were able to get Mr. Krueger out of the car and onto the ground, but they were in the middle of the highway at night, so it was urgent that they get him handcuffed and restrained so that they could get out of the middle of the highway.  *Id*.

Once Mr. Krueger was on the ground, the Deputies repeatedly tried to grab his hands behind his back to handcuff him.  Docket No. 306, at 16; Docket No. 323, at 12; Docket No. 351, at 10.  The Deputies shouted orders for him to show his hands and to give his hands to the officers, but he did not comply.  *Id*.  Mr. Krueger pulled his hands away and tucked them underneath his torso.  *Id*.  In an effort to get him to comply, Deputy Orr used a taser, but it did not subdue Mr. Krueger.  He continued to struggle, fight, and pull his hands away from the Deputies.  *Id*.  The Deputies continued their efforts to pull out his arms, and he continued to fight.  *Id*.

The Phillips Body Cam video begins after the Deputies had been struggling with Mr. Krueger for several minutes.  Docket No. 306, at 16-17; Docket No. 323, at 12-13; Docket No. 351, at 10; Phillips Body Cam.  The Deputies repeatedly gave commands for Mr. Krueger to turn over and to give them his hands, but Mr. Krueger continued to struggle, fight, and kick the

---

[11] Deputy Phillips also testified that Mr. Krueger grabbed his gun.  Plaintiffs "absolutely" deny this, arguing that Phillips' first version referenced only his arm.  Plaintiffs' citations are to Phillips' deposition and his OSBI interview, and they do not support Plaintiffs' argument of differing accounts by Phillips.  Docket No. 323, at 11.

Deputies. Docket No. 306, at 17; Docket No. 323, at 12; Docket No. 351, at 10; Phillips Body Cam, at 21:56:44 – 22:02:10. After being kicked repeatedly, Deputy Phillips tasered Mr. Krueger. *Id*. Mr. Krueger then grabbed onto the taser. *Id*. The Deputies then struck Mr. Krueger and ultimately retrieved the taser. *Id*.

When the EMT Defendants arrived, they helped get Mr. Krueger's right hand behind his back and get him cuffed. Docket No. 306, at 18; Docket No. 323, at 13; Docket No. 351, at 11; Phillips Body Cam, at 22:01:05-10. Soon after Mr. Krueger's arms were cuffed together, other officers who had arrived took over. Docket No. 306, at 18; Docket No. 323, at 13; Docket No. 351, at 11; Phillips Body Cam, at 22:01:10-50. Deputies Orr and Phillips stood up, walked away, and had no further physical contact with Mr. Krueger. *Id*. Mr. Krueger can be heard saying "get off me" repeatedly just before Deputies Orr and Phillips walked away. Phillips Body Cam, at 22:01:35-39.

After Deputies Orr and Phillips walked away, they were talking to other officers and not looking back to see what was happening with Mr. Krueger. Docket No. 306, at 18; Docket No. 323, at 13; Docket No. 351, at 11. Deputies Orr and Phillips did not observe what happened with Mr. Krueger until they heard an officer call out that he was not breathing. *Id*. At that time, they walked back over to the scene and saw the EMT Defendants get the stretcher out, load Mr. Krueger onto it and into the ambulance, and drive away. *Id*. Mr. Krueger was 36 years old, 6'3, weighed 156 pounds, and was bipolar. Docket No. 323, at 14.

**<u>Deputy Lott</u>**

At approximately 10:00 p.m. Deputy Lott was on patrol in the Wagoner area and heard the radio call from Deputy Orr saying that he had a person coming out of a car. Docket No. 308, at 7; Docket No. 325, at 8. Deputy Lott advised dispatch that he was on the way. *Id*. While

driving to the location, he heard a second call from Deputy Orr saying with urgency something to the effect of "got one fighting." *Id*. Deputy Lott activated his lights and siren and headed towards the scene. *Id*. When he activated his lights and siren, Deputy Lott's dashcam video was also activated. *Id*. A train stalled Deputy Lott's progress to the scene. Docket No. 308, at 8; Docket No. 325, at 8. While on his way, Deputy Lott heard another call from Deputy Orr saying, "I need help." *Id*.

Once the train passed, Deputy Lott was able to proceed to the scene. Docket No. 308, at 8; Docket No. 325, at 8-9. As he was pulling up, he heard Deputy Orr advise on the radio that he had "one in custody." Deputy Lott parked blocking oncoming traffic so that people on the ground would not get hit. *Id*. He then exited his vehicle and saw Deputies Orr and Phillips as well as two EMTs present with Mr. Krueger who was handcuffed and laying face down on the pavement. *Id*.

Deputy Lott arrived on the scene at the same time as other officers from the WCSO and the City Police Department. *Id*. As Deputy Lott approached, Mr. Krueger was still kicking, his eyes were open, and he appeared to be fully conscious and breathing. *Id*. While other officers were on the ground with Mr. Krueger, Deputy Lott placed his foot at the top of Mr. Krueger's right shoulder for approximately one minute. Docket No. 308, at 8-9; Docket No. 325, at 8-9; AXON Body Cam, at 2:02 – 3:11.[12]

While Mr. Krueger was still moving and kicking his legs, other officers asked if there was a way to "hobble" him – to connect the leg restraints to the handcuffs with a chain. Docket No. 308, at 9; Docket No. 325, at 9. Deputy Lott retrieved a chain from his vehicle and gave it to

---

[12] Deputy Lott states that he did not place any weight on Mr. Krueger's shoulder, but that cannot be determined from the video. Plaintiff argues that it is unlikely he balanced on his other foot for an entire minute without placing any weight on the one on Mr. Krueger's shoulder.

the officers. *Id*. Deputy Lott did not participate in connecting the chain to the leg shackles or handcuffs. *Id*. Deputy Lott saw that Mr. Krueger's handcuffs and leg shackles were then connected by 12-14 inches of chain. *Id*. Deputy Lott observed officers with their knees on Mr. Krueger. *Id*.

Deputy Lott was not present with Mr. Krueger at all times, as he walked over to talk to Deputies Orr and Phillips. *Id*. Deputy Lott was with Deputies Orr and Phillips when he heard someone ask if Mr. Krueger was still breathing. Docket No. 308, at 10; Docket No. 325, at 9. Until that time, he believed that Mr. Krueger was still breathing and not experiencing any medical emergency. After the EMT Defendants loaded Mr. Krueger into the ambulance, Deputy Lott drove the ambulance to the hospital. Docket No. 308, at 10; Docket No. 325, at 10.

### Lieutenant Crockett

Lieutenant Crockett arrived on the scene after Deputies Orr and Phillips had disengaged from Mr. Krueger. Docket No. 302, at 11; Docket No. 324, at 12. Lieutenant Crockett initially checked on the condition of Deputies Orr and Phillips, but after observing Mr. Krueger kick an officer, she assisted by kneeling down on Mr. Krueger's left buttock and left upper thigh and assisted placing the leg irons on him. *Id*. Lieutenant Crockett kneeled down on Mr. Krueger's left buttock and left upper thigh for approximately forty-five seconds to a minute total, until he had been placed in leg irons. Docket No. 302, at 11-12; Docket No. 324, 12-13, AXON Body Cam, at 2:15 – 3:16. She then left the area and went to her vehicle and had no further contact with Mr. Krueger. *Id*.

### Sheriff Elliott

At the time of the subject incident, the WCSO had a Use of Force Policy which required that deputies use only force that is objectively reasonable, necessary, and proportionate to

effectively bring a person or an incident under control, while protecting the deputy or others from imminent harm. Docket No. 301, at 11-12; Docket No. 329, at 12; Docket No. 343, at 1-2. In determining whether a use of force was objectively reasonable, the policy required deputies to pay careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the deputies or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id*.

The WCSO's Office Use of Force Policy required deputies to use an amount of force that is reasonably necessary to effect a lawful arrest; prevent the escape of a person from custody following arrest; apprehend a person who has escaped from lawful arrest; or protect himself or others from the infliction of serious bodily harm. Docket No. 301, at 12; Docket No. 329, at 12; Docket No. 343, at 1-2. The policy forbids the use of unnecessary or excessive force, and forbids the use of force to punish or retaliate; in the absence of a legitimate need for the use of force; in a manner inconsistent with WCSO policies, training or guidelines; and against a person incapable of resisting arrest. *Id*.

At the time of the subject incident, the WCSO had a policy regarding the use of Tasers. The policy provides that Tasers may only be used when objectively reasonable and necessary to control a suspect that is actively resisting arrest and/or where the use of an empty hand control technique would be ineffective or not reasonable under the circumstances, and that such devices may only be used by deputies that have been trained in their use. The policy further sets forth a number of other factors which must be considered by deputies when using such devices, including assessment of successive applications of the device where the initial application proves ineffective. *Id*.

14

At the time of the subject incident, the WCSO had a policy regarding dealing with emotionally disturbed persons.  The policy provides that deputies may take persons into protective custody whom they reasonably believe require emergency mental health treatment, and describes in detail the bases for such a determination.  The policy further requires deputies to have an entry level training course regarding the interaction of persons suspected of suffering from mental illness and to complete a refresher-training course at least every three years, which may be fulfilled by CLEET's annually required two hours of continuing law enforcement training relating to recognizing and managing a person appearing to require mental health treatment of services.  Docket No. 301, at 13; Docket No. 329, at 13-14; Docket No. 343, at 1-2.

At the time of the subject incident, the WCSO had Rules and Regulations which required all employees to maintain a current and complete copy of the WCSO's policies, procedures, rules, and regulations, and requiring them to know and obey those directives.  Docket No. 301, at 13; Docket No. 329, at 14; Docket No. 343, at 1-2.  The Rules and Regulations also required all employees to be knowledgeable of and abide by the laws of the State of Oklahoma.  *Id*.

At the time of the incidence, Deputies Orr and Phillips had received copies of the WCSO's Policy and Procedure manual.  *Id*.

Deputies Orr and Phillips received Taser training on March 28, 2019.  *Id*.

At the time of the subject incident, Deputy Orr was a CLEET certified law enforcement officer with over 500 hours of CLEET training.  Docket No. 301, at 13-14; Docket No. 329, at 14; Docket No. 343, at 1-2.  Deputy Orr's training included training on conducting stops, arrests, searches and seizures, how to conduct interactions with individuals who are confirmed or suspected to suffer from mental illness, general officer safety in regard to traffic stops, defensive tactics and maneuvers, and the prohibition on the use of excessive force.  *Id*.  Deputy Orr was

trained to, if allowed by the circumstances, ask the subject to comply, tell the subject to comply, then make the subject comply with a lawful order. *Id*. Deputy Orr was trained that after an altercation, he should get the subject into the recovery position as soon as possible. *Id*.

At the time of the subject incident, Deputy Phillips was a CLEET certified law enforcement officer with over 500 hours of CLEET training. Docket No. 301, at 14; Docket No. 329, at 14; Docket No. 343, at 1-2. Deputy Phillips' training included training on the circumstances under which he could pull his service weapon and point it at someone, and training on conducting stops, arrests, searches and seizures, how to conduct interactions with individuals who are confirmed or suspected to suffer from mental illness, general officer safety in regard to traffic stops, and defensive tactics maneuvers. *Id*.

At the time of the subject incident, Lieutenant Crockett was a CLEET certified law enforcement officer. *Id*. Lieutenant Crockett's training included training on traffic stops, arrests, use of force, excessive force, the duty to intervene, positional asphyxia, and the use of hobble restraints. *Id*. Her training on positional asphyxia included instruction on the need to make sure the arrestee's breathing is not compromised and to place them in a recovery position as soon as they were under control. *Id*.

At the time of the subject incident, Deputy Lott was a CLEET certified law enforcement officer. Docket No. 301, at 15; Docket No. 329, at 14; Docket No. 343, at 1-2. Deputy Lott's training included training on conducting stops, arrests, searches and seizures, how to conduct interactions with individuals who are confirmed or suspected to suffer from mental illness, general officer safety in regard to traffic stops, and defensive tactics maneuvers. *Id*.

### III.   Federal Claims

As stated above, Plaintiffs brought claims for relief against the County Defendants pursuant to § 1983 for illegal arrest and for excessive force in violation of Mr. Krueger's Fourth Amendment rights.  Additionally, while it is not abundantly clear in the Fourth Amended Complaint, Plaintiffs arguably also brought claims against the County Defendants for failure to intervene to stop other law enforcement officers from using excessive force against Mr. Krueger. As the County Defendants have each asserted the defense of qualified immunity, the burden shifts to Plaintiffs to show: (1) that each of the County Defendant's *individual actions* violated a federal constitutional or statutory right, and (2) that the right was clearly established at the time of the unlawful conduct.  Additionally, Plaintiffs brought claims against Sheriff Elliott in his official capacity based on WCSO's policies, customs, and procedures, as well as for inadequate training and supervision.

#### A.  Illegal Arrest

##### (i)   Constitutional Violation Prong

A warrantless arrest violates the Fourth Amendment unless the arrest was supported by probable cause.  *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008) (citation omitted). In determining whether probable cause existed, the court considers whether the "facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  *Id*. (citation omitted).  This is an independent and objective test.  *Id*.  "Thus an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime."  *Id*. (citations omitted).

Additionally, an officer's reliance on another officer's conclusions must be "objectively

reasonable." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 882 (10th Cir. 2014).  An officer who acts "in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable."  Id. (citations and internal quotations omitted).

### Deputies Phillips and Orr

The facts and circumstances within Deputies Phillips' and Orr's knowledge were that after Deputy Orr saw Mr. Krueger talking to himself at the QuikTrip,[13] Deputy Phillips then saw him driving at a high rate of speed and failing to maintain his lane of travel.  Deputy Phillips had probable cause to stop him for traffic violations and to investigate a possible DUI.

When Mr. Krueger then stopped in the center lane of a busy highway, flung open his door, and began to search around in his vehicle, the Deputies were objectively reasonable in taking precautions for the safety of themselves, Mr. Krueger, and others on the highway.  Such precautions include drawing their service weapons.  Despite Plaintiffs' counsel's incredulity at the possibility that the Deputies believed Mr. Krueger may have been searching for a gun, common knowledge is in the Deputies' favor.  In fact, in the context of Fourth Amendment excessive force claims, the Tenth Circuit has stated that "[a] reasonable officer *need not await the 'glint of steel'* before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'"  *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (emphasis added) (citation omitted).

When Mr. Krueger then ignored the Deputies' commands to show his hands and

---

[13] Plaintiffs make much ado of the fact that Mr. Krueger's odd behavior at the QuikTrip was not probable cause.  Plaintiffs cite no authority and the court knows of none that would prevent law enforcement from following a person after that person was acting strangely in public to determine if further investigation was necessary.

continued to dig around in his vehicle, the Deputies had further objective reasons to believe that he was committing or about to commit a very serious offense.  When they tried to remove him from the vehicle and Mr. Krueger grabbed Deputy Phillips, they had probable cause to arrest him.  Deputies Phillips' and Orr's motions are granted as to this claim.

**Deputy Lott and Lieutenant Crockett**

During their struggle with Mr. Krueger, Deputy Orr radioed for help stating, "one fighting."  Moreover, when Deputy Lott arrived on the scene Mr. Krueger was still kicking. While Lieutenant Crockett and Deputy Lott may not have known the reason(s) Mr. Krueger was initially stopped, the facts and circumstances within their knowledge of his fighting and resisting Deputies Phillips and Orr were sufficient in themselves to warrant a man of reasonable caution in the belief that an offense had been committed.  Lieutenant Crockett's and Deputy Lott's motions, therefore, are also granted as to this claim.

**(ii)      Clearly Established Prong**

As Plaintiffs failed to show that Lieutenant Crockett or any of the Deputies Phillips, Orr, or Lott violated Mr. Krueger's Fourth Amendment right to be free of unlawful arrest, the court need not address this prong.  Nevertheless, the court notes that Plaintiffs have not cited cases showing that it would have been clear to a reasonable officer that any of the conduct above was in violation of Mr. Krueger's Fourth Amendment right to be free of unlawful arrest in the situation.

**B.  Excessive Force**

**(i)      Constitutional Violation Prong**

An excessive force claim can be brought under the Fourth, Fifth, Eighth, or Fourteenth Amendment, "and each carries with it a very different legal test." *Estate of Booker*, 745 F.3d at

418-19.  "When an excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."  *Packard v. Budaj*, 86 F.4th 859, 865 (10th Cir. 2023) (citation and internal quotation marks omitted).  "[A]n excessive force claim brought under the Fourth Amendment depends on the objective reasonableness of the officer's actions . . . ."  *Estate of Booker*, 745 F.3d at 419.

The test of reasonableness under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case."  *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court must consider (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest or attempting to evade arrest by flight.  *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id*. at 396-97. The court must weigh the "totality of the circumstances."  *Packard*, 86 F.4th at 866 (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).  Ultimately, the question is whether the officers' actions were "'*objectively reasonable*' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397 (emphasis added).

**<u>Deputies Phillips and Orr</u>**

Regarding the amount of force used by Deputies Phillips and Orr in detaining Mr. Krueger, there are disputed issues of material fact.  There was a considerable amount of blood on

20

the ground outside Mr. Krueger's car, and photos of Mr. Krueger at the hospital show his head covered in blood. Docket Nos. 327-13 and 327-14. An autopsy photo shows a large gash in Mr. Krueger's head. Docket No. 327-22. Plaintiffs contend that when Deputies Phillips and Orr removed Mr. Krueger from his car, they slammed his head to the ground. Additionally, while it is undisputed that both Deputies Phillips and Orr struck Mr. Krueger and applied a taser, the number of strikes and taser applications is disputed.

To be clear, once Mr. Krueger grabbed Deputy Phillips and arguably before then, each of the *Graham* factors – (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest – weighed in the Deputies' favor. Nevertheless, while it was objectively reasonable for Deputies Phillips and Orr to remove Mr. Krueger from his car, it would not be objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation, for them to slam his head to the ground. Moreover, Plaintiffs have shown enough evidence to create issues of material fact as to whether the amount of force used thereafter was objectively reasonable under the circumstances. Plaintiffs have presented sufficient disputed evidence to meet their burden to show that Deputies Phillips and Orr used excessive force and thus to survive the summary judgment motion.

### Deputy Lott and Lieutenant Crockett

Deputy Lott and Lieutenant Crockett arrived later. While Mr. Krueger was face down and handcuffed, Deputy Lott placed his foot over or on Mr. Krueger's right shoulder for over a minute. AXON Body Cam, at 2:02 – 3:11. Deputy Lott also retrieved and delivered to other officers the chain used to hobble Mr. Krueger. While he was face down and handcuffed, Lieutenant Crockett placed her knees on Mr. Krueger's left buttock and upper thigh for at least

forty-five seconds and assisted placing leg irons on him.  AXON Body Cam, at 2:15 – 3:16.

Again, the *Graham* factors weigh in their favor.  As to the first, both Deputy Lott and Lieutenant Crockett received Deputy Orr's radio request stating, "one fighting."  When Deputy Lott arrived on the scene, Mr. Krueger was still kicking.  As to the second factor, Mr. Krueger's resistance of officers in the middle of the highway posed an immediate threat to the safety of himself, the deputies and officers, as well as others on the highway.  As to the third factor, Mr. Krueger was actively resisting arrest.

Nevertheless, under the totality of the circumstances, Plaintiffs have shown enough to create genuine issues of material fact as to whether Deputy Lott's and Lieutenant Crockett's use of force was objectively reasonable in the light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  Mr. Krueger was face-down in a prone position and restrained by handcuffs when Lieutenant Crockett along with other officers placed her weight on him for at least forty-five seconds.  He was face-down in a prone position and restrained by handcuffs when Deputy Lott placed his foot on him for at least a minute, and whether he put his weight on him is a question of fact for a jury.  Plaintiffs have presented sufficient disputed evidence to meet their burden to show that Deputy Lott and Lieutenant Crockett used excessive force and thus to survive the summary judgment motion.

### (ii)     Clearly Established Prong

Because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, ... police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."  *Choate v. Huff*, 773 Fed.Appx. 484, 489 (10th Cir. 2019) (citing *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018)).

**Deputies Phillips and Orr**

Plaintiffs do not cite specific case law where an officer or officers slammed a person's head into the ground, but cite *District of Columbia v. Wesby*, 583 U.S. 48 (2018) in arguing that "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id*. at 64 (citation omitted). The court agrees that if the jury were to find the facts in Plaintiffs' favor, slamming his head to the ground would be the rare obvious case. Accordingly, the motions for summary judgment are denied as to the excessive force claims against Deputies Phillips and Orr.

**Deputy Lott and Lieutenant Crockett**

Plaintiffs have cited existing precedent that squarely governs the specific facts at issue with regard to Deputy Lott and Lieutenant Crockett's motions. Docket No. 321. Plaintiffs cited *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008), which involved an altercation between police and an individual on a busy highway. The Circuit held that if "the facts plaintiffs proffered are true and the jury draws the inferences most supportive of plaintiffs' position, then the law was clearly established that applying pressure to Mr. Weigel's upper back, once he was handcuffed and his legs restrained, was unconstitutionally unreasonable due the significant risk of positional asphyxiation associated with such actions. We said this overtly, if not by strong and deducible inference, in *Cruz*." *Id*. at 1155 (citing *Cruz v. City of Laramie, Wyo*., 239 F.3d 1183 (10th Cir. 2001)). The Circuit continued: "Moreover, cases from other circuits have stated it is 'clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.'" *Id*. (citations omitted).

In *Estate of Booker*, the Tenth Circuit reiterated: "In *Weigel*, we agreed with other

circuits that it was 'clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.'" *Estate of Booker*, 745 F.3d at 424. "Here, Deputy Robinette placed an estimated 142.5 pounds—more than Mr. Booker's overall weight—on Mr. Booker's back while he was handcuffed on his stomach. Because of Mr. Booker's prone, restrained, positions, the placement of weight exceeding Mr. Booker's total body weight could be construed as substantial or significant." *Id*. Plaintiffs have presented sufficient disputed evidence to meet their burden to show that Deputy Lott and Lieutenant Crockett placed their weight on Mr. Krueger's back along with other officers – the total weight of deputies and officers easily exceeding Mr. Krueger's total body weight – while he was handcuffed and in a prone position on his stomach.

The motions for summary judgment are denied as to the excessive force claims against Deputy Lott and Lieutenant Crockett.

## C. Duty to Intervene to Prevent Excessive Force

### (i)     Constitutional Violation Prong

A "law enforcement official has an affirmative duty to intervene to prevent another law enforcement official's use of excessive force." *Mick v. Brewer*, 76 F.3d 1127, 1136 (1996). To prevail on such a claim, Plaintiffs must show: "that 1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so." *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022).

As stated above, Plaintiffs have presented sufficient disputed evidence to meet their burden to show that Deputies Phillips, Orr, and Lott and Lieutenant Crockett used excessive

24

force on Mr. Krueger.  Moreover, they were each there to observe other deputies and officers. Thus, to the extent there was a constitutional violation, Plaintiffs have presented sufficient disputed evidence to meet their burden to show that each officer observed it happening, and each officer had a realistic opportunity to intervene, but failed to do so.

### (ii)   Clearly Established Prong

It is clearly established that law enforcement officers have a duty to intervene to prevent other officer's use of excessive force.  *Brewer*, 76 F.3d at 1136.  In *Weigel*, a similar case cited by Plaintiffs and included above, the Tenth Circuit noted that as it recently recognized, it is clearly established:

> that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that excessive force is being used . . . .  In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Weigel v. Broad*, 544 F.3d 1143, 1153, n.4 (10th Cir. 2008) (citing Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008)).

The motions for summary judgment are denied as to the failure to intervene to prevent excessive force claims against Deputies Phillips, Orr, Lott and Lieutenant Crockett.

### D.  Official Capacity Claims against Sheriff Elliott[14]

Within each of the first two § 1983 claims – illegal arrest and excessive force – Plaintiffs include claims against Sheriff Elliott in his official capacity for unconstitutional policies,

---

[14] There is no evidence that Sheriff Elliott was personally involved in the events giving rise to this litigation.

customs, and procedures.  Plaintiffs' third claim for relief is for inadequate training and supervision against Sheriff Elliott in his official capacity.  For Plaintiffs to prevail on these claims, they must first show an underlying constitutional violation.  *Fenn v. City of Truth or Consequences*, 983 F3d 1143, 1150 (10th Cir. 2020) (noting that "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers.") (citing *Hinton v. City of Elwood, Kan*., 997 F.2d 774, 782 (10th Cir. 1993)).

As Plaintiffs have failed to show a violation of Mr. Krueger's Fourth Amendment rights based on illegal or unlawful arrest, Sheriff Elliott is entitled to summary judgment on these claims as they pertain to the illegal arrest claims.  Plaintiffs, however, have shown sufficient evidence to overcome summary judgment as to the excessive force claims against the County Defendants who were WCSO employees.

Sheriff Elliott may not be held liable under a theory of *respondeat superior*, but since *Monell v. Department of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), he may be held liable if the enforcement of the WCSO's policies or customs by its employees "causes a deprivation of a person's federally protected rights."  *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010) (citation omitted).  Section 1983 claims against a municipality are the same as claims against a municipal official acting in his or her official capacity.  *Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998).

To prevail on their § 1983 claims against Sheriff Elliott, Plaintiffs must show "1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged."  *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although

not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law' "; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

Plaintiffs here allege the first, second, and fifth forms.  Plaintiffs have provided no evidence of any formal policy that directly caused a violation.  In fact, the WCSO policies listed herein would prevent the violations alleged.  Plaintiffs argue the existence of informal WCSO customs but have presented no evidence of such.

To establish liability for inadequate training or supervision on the use of force, Plaintiffs must show deliberate indifference on the part of the WCSO.  *Myers*, 151 F.3d at 1318.  Plaintiffs must meet a four-part test to show that:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Id*. (citation omitted).  As is evidenced from the statements of fact above, Deputies Phillips, Orr, and Lott and Lieutenant Crockett were all CLEET certified officers with training on the use of force.  Plaintiffs have failed to show any specific deficiency in the training or supervision of Deputies Phillips, Orr, or Lott, or Lieutenant Crockett that was obvious and closely related to the alleged violations.  Plaintiffs have further failed to show deliberate indifference on the part of the WCSO.

While not specifically alleged in the Fourth Amended Complaint, Plaintiffs argue that by awarding them medals of valor, Sheriff Elliott ratified the actions taken by Deputies Phillips and Orr on July 1, 2019.  A municipality may be found liable under a ratification theory when "a final decision maker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson*, 627 F.3d 784, at 790.  Deputies Phillips and Orr were awarded medals of valor based on their actions taken with Mr. Krueger on July 1, 2019.  Docket No. 327-27.  Sheriff Elliott signed the nomination for Deputy Phillips on the same day – July 1, 2019.  *Id.* at 3.  If a jury were to find that Deputies Phillips and Orr used excessive force in violation of Mr. Krueger's Fourth Amendment rights, the jury could also find that Sheriff Elliott ratified the violations with the medals of valor.  Sheriff Elliott's motion, therefore, is denied as to this claim.[15]

## IV.  State Law Claims

### A.  Negligence and Wrongful Death

Under Plaintiffs' fifth claim for relief, they allege that Sheriff Elliott was negligent in the hiring, training, supervision, and retention of the County Defendants.  The GTCA provides that the state or political subdivision is not liable for losses resulting from: "Performance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees."  51 OKLA. STAT. § 155(5).  The Oklahoma Court of Civil Appeals has found that "[i]t is . . . settled that a [political subdivision's] hiring, training, and supervision

---

[15] As has the Western District of Oklahoma, the court "acknowledges that there is some disagreement among the circuits regarding the ratification theory and some conflict between the ratification theory and the causation requirement as outlined in *Monell*, 436 U.S. at 691, 694." *Coffee v. City of Okla. City, Okla.*, No. CIV-08-239-W, 2009 WL 10669175, at *5 n.11 (W.D. Okla. Aug. 4, 2009).  In any event, the court will allow this claim to go to a jury.

decisions are discretionary and therefore a [political subdivision] may not be liable for damages resulting from those decisions." *Jackson v. Oklahoma City Pub. Sch*., 333 P.3d 975, 979 (Okla. Ct. Civ. App. 2014) (citation omitted). *Jackson*, however, is not a precedential decision.

In examining 51 OKLA. STAT. § 155(4)-(6), the Oklahoma Supreme Court has noted that "[a]lmost all acts of government employees involve some element of choice and judgment." *Smith v. City of Stillwater*, 328 P.3d 1192, 1198 (Okla. 2014) (citation omitted). The Court held that "the government retains its immunity with respect to formulation of policy, but is subject to liability for routine decisions and daily implementation of the policy or planning level decisions." *Id*. (citation omitted). The questions of whether hiring, training, supervision, and retention fall under the former or the latter have not been decided by the Oklahoma Supreme Court. The Northern District of Oklahoma, however, has noted that "the clear weight of authority supports finding that hiring, training, supervision, monitoring, and retention are actions that implicate a political entity's policy and planning functions and therefore fall under the discretionary function exemption of § 155(5)." *Lankamp v. Mayes Emergency Srvcs. Trust Auth*., No. 16-CV-0676-CVE-FHM, 2017 WL 875483, at *4 (N.D. Okla. Mar. 3, 2017) (citing *Johnson v. Indep. Sch. Dist. No. 89 of Okla. Cnty.*, No. CIV–15–680–D, 2016 WL 1270266, at *8 (W.D. Okla. Mar. 31, 2016) (negligent supervision); *Burris v. Okla. ex rel. Okla. Dep't of Corrections*, No. CIV–13–867–D, 2014 WL 442154, at *9 (W.D. Okla. Feb. 4, 2014) (negligent hiring, training, supervision, and retention); *Seals v. Jones*, No. 12–DV–569–JED–TLW, 2013 WL 5408004, at *4 (N.D. Okla. Sept. 25, 2013) (negligent hiring and retention); Houston, 949 F. Supp. 2d at 1109 (negligent supervision and retention); *Fumi v. Bd. of Cnty. Comm'rs of Rogers Cnty.*, No. 10–CV–769–TCK–PJC, 2011 WL 4608296, at *6 (N.D. Okla. Oct. 3, 2011) (negligent training and supervision); *Burns v. Holcombe*, No. 09–CV–152–JHP, 2010 WL

29

6:21-cv-00044-RAW   Document 363   Filed in ED/OK on 03/26/24   Page 30 of 33

2756954, at *15 (E.D. Okla. July 12, 2010) (negligent hiring, training, and supervision); *Jackson v. Okla. City Pub. Schs.*, 333 P.3d 975, 979 (Okla. Civ. App. 2014) (negligent hiring, training, and supervision)).

In any event, the court need not answer the question as to whether this claim is barred by § 155(5). As held above, Plaintiffs have not shown that Sheriff Elliott was negligent in his training or supervision of the County Defendants. Plaintiffs also have not shown that Sheriff Elliott was negligent in his hiring or retention of the County Defendants. Plaintiffs argue that Deputy Lott was terminated by the WCSO, but without more, they have not shown that Sheriff Elliott was negligent in his hiring or retention. Accordingly, the Sheriff's motion is granted as to this claim.

### B. Assault and Battery

<u>**County Defendnts**</u>

The events giving rise to this action occurred on July 1, 2019. The original Complaint was filed more than one year, but less than two years later on February 16, 2021. As Defendants argue, the statute of limitations for an action for assault and battery in Oklahoma is one year. 12 OKLA. STAT. § 95(A)(4).

Plaintiffs argue that a two-year statute of limitations applies to an assault and battery claim brought in a § 1983 action. While Plaintiffs are correct that a two-year statute of limitations period applies to § 1983 assault and battery claims, Plaintiffs framed their assault and battery claims as state law claims, not as § 1983 claims. Plaintiffs cite to the Fourth Amendment within their first three claims for relief, but nowhere within their fourth, fifth or sixth claims for relief do they cite to § 1983 or to any federal law. Rather, Plaintiffs specifically allege that the acts of the individual defendants "*constitute the tort of assault and battery under Oklahoma state*

*law and the common law*." Docket No. 196, at 16 (emphasis added).  Plaintiffs allege that the individual defendants' "use of force, at times during the detention, arrest and handcuffing of Mr. Krueger, were so excessive, malicious, willful and wanton, and a usurpation of the power lawfully vested in them, as to cause the death of Mr. Krueger, for which the Defendants can alternatively be found as *acting outside the scope of their employment and be individually liable*."  *Id*. (emphasis added).

  The court notes that Plaintiffs also allege that they "timely filed a notice of tort claim under the Oklahoma Governmental Tort Claims Act with Wagoner County asserting the assault and battery of defendants Phillips and Orr, and this action is timely filed following the denial of that claim."[16]  *Id*. at 17.  Plaintiffs do not similarly allege that they filed a notice of tort claim with regard to the Deputy Lott and Lieutenant Crockett.  In any event, Plaintiffs' allegations of the intentional tort of assault and battery as filed against the individual defendants fall outside the scope of their employment[17] and thus outside the purview of the GTCA.  *See Hall v. Oklahoma Dept. of Human Srvcs*., No. 15-CV-0670-CVE-TLW, 2016 WL 2903266, at *9, n. 1 (N.D. Okla. May 18, 2016) (citations omitted).

  Accordingly, Oklahoma's one-year statute of limitations applies to the assault and battery claims against the County Defendants.  The motions are granted as to Plaintiffs' sixth claim for

---

[16] Plaintiffs have not attached their notice of tort claim or any denial thereof to any of the five iterations of their Complaint or included such with their exhibits.  While Plaintiffs allege in each Complaint that they have met all of the notice requirements of the GTCA, they did not include dates of their notice and/or any denial.  Within a response to a motion to dismiss, however, Plaintiffs informed the court that their tort claim notice was submitted on June 24, 2020.  Docket No. 116, at 10.  Plaintiffs did not explicitly state that they did not receive a written denial, but they included that 90 days after their notice was September 22, 2020 and 180 days after that was March 21, 2021.  *Id*.

[17] Moreover, to the extent Plaintiffs allege the County Defendants acted within the scope of their employment, pursuant to the GTCA, they would not be proper Defendants.  51 OKLA. STAT. §§ 153(C) and 163(C).

relief – assault and battery – against the County Defendants.

**Sheriff Elliott**

These claims as against Sheriff Elliott are timely under the GTCA to the extent that Plaintiffs submitted their tort claim on June 24, 2020 and did not receive a denial as they have previously stated.  Docket No. 116, at 10.  As the court found above that the reasonableness of the use of force by the County Defendants is a question of fact for a jury, this claim remains. The Sheriff's motion is denied.

V.       **Summary**

The court rules as follows on Sheriff Elliott's and the County Defendants' motions:

- Sheriff Elliott's motion [Docket No. 301] is hereby GRANTED as to the § 1983 claims associated with unlawful arrest and the § 1983 failure to train or supervise claims.  It is GRANTED as to the state law claim for negligence and wrongful death. It is DENIED as to the § 1983 claims of unconstitutional policies or customs in the form of ratification of the use of excessive force.  It is DENIED as to the state law claim for assault and battery.

- Lieutenant Crockett's motion [Docket No. 302] is hereby GRANTED as to the § 1983 unlawful arrest and state law assault and battery claims and DENIED as to the § 1983 excessive force and failure to intervene claims;

- Deputy Phillips' motion [Docket No. 306] is hereby GRANTED as to the § 1983 unlawful arrest and state law assault and battery claims and DENIED as to the § 1983 excessive force and failure to intervene claims;

- Deputy Orr's motion [Docket No. 307] is hereby GRANTED as to the § 1983

32

unlawful arrest and state law assault and battery claims and DENIED as to the § 1983 excessive force and failure to intervene claims; and

- Deputy Lott's motion [Docket No. 308] is hereby GRANTED as to the § 1983 unlawful arrest and state law assault and battery claims and DENIED as to the § 1983 excessive force and failure to intervene claims.

**IT IS SO ORDERED** this 26th day of March, 2024.

_____

**THE HONORABLE RONALD A. WHITE**
**UNITED STATES DISTRICT JUDGE**
**EASTERN DISTRICT OF OKLAHOMA**